1   OFFICE OF ADMINISTRATIVE TRIALS AND HEARINGS

2   HEARINGS DIVISION

3   _____

4   TAXI AND LIMOUSINE COMMISSION,

5            Petitioner,

6   vs.                          Summons No.: 73090726A

7   MATTHEW A. JOHNS,

8            Respondent.
    _____
9

    DATE:        October 19, 2022
10               OATH Hearing

11  HELD:        31-00 47th Avenue, 3rd Floor
                 Long Island City, NY 11101
12
    BEFORE:      ELENA YUN
13               HEARING OFFICER

14  APPEARANCES: JAMES GLYNN, ESQ.
                 ATTORNEY FOR TAXI AND LIMOUSINE COMMISSION
15

16               MANUEL MOSES, ESQ.
                 ATTORNEY FOR MATTHEW A. JOHNS
17

18  ALSO PRESENT: MATTHEW A. JOHNS

19               OFFICER ABDURRAHAM, WITNESS

20

21

22  _____

23  DIGITALLY RECORDED PROCEEDING, TRANSCRIBED BY:

24               LYNETTE L. CHASE

25           Bee Reporting Agency, Inc


        BEE REPORTING AGENCY, INC.  (516) 485-2222

TAXI AND LIMOUSINE COMMISSION/JOHNS 10/19/2022                    2

1                              INDEX

2     OFFICER ABDURRAHAM                                    PAGE

3     DIRECT EXAMINATION BY MR. GLYNN                       14

4     CROSS-EXAMINATION BY MR. MOSES                        19

5     REDIRECT EXAMINATION BY MR. GLYNN                     39

6     RECROSS-EXAMINATION BY MR. MOSES                      46

7

8     MATTHEW A. JOHNS

9     DIRECT EXAMINATION BY MR. MOSES                       50

10    CROSS-EXAMINATION BY MR. GLYNN                        62

11    REDIRECT EXAMINATION BY MR. MOSES                     79

12

13

14                           EXHIBITS

15    RESPONDENT'S EXHIBITS                  IDENTIFIED ADMITTED

16    1   PAY STUBS                            50        53

17    2   JETBLUE RESERVATION                  55        56

18    3   DRIVER'S LICENSE AND VEHICLE REGISTRATION  60  61

19    4   SUMMONS                              62        62

20

21

22

23

24

25

Case 1:23-cv-03497-PKC-SJB   Document 20-3   Filed 08/24/23   Page 3 of 85 PageID #: 286

1          (On the record.)

2               THE COURT:  Good morning.

3               MR. MOSES:  Good morning.  Manuel Moses,

4      attorney for Matthew Johns, and Mr. Johns are present.

5               THE COURT:  Thank you.

6               So, Mr. Moses, is -- are you and your client

7      ready to proceed with the hearing today?

8               MR. MOSES:  Yes.

9               THE COURT:  Okay.  Thank you.

10              So I'm the hearing officer.  I'm the judge on

11      the case today.  Just wanted to let you know I did reach

12      out to the TLC to join us on this call so that we can

13      proceed with the proceedings today.

14              I see that you have been here a couple more

15      times -- previously so you know the drill.  So I'm just

16      going to put you on hold until they get on the line and

17      we'll discuss this further.

18              MR. MOSES:  Okay.  I do have some exhibits so I

19      guess I'll wait until I get their e-mail and we'll send

20      them to you as well.

21              THE COURT:  Okay.  Thank you.

22              I'm going to put you on hold now.  Thank you so

23      much.

24              MR. MOSES:  Thank you.

25              (Whereupon, a recess was taken.)

1          MR. GLYNN:  Good morning, Your Honor.  James

2     Glynn on behalf of the Commission.

3          THE COURT:  Good morning, Mr. Glen.

4          Is the Commission ready to proceed today?

5          MR. GLYNN:  Yes, Your Honor.

6          THE COURT:  All right.  And I just want to

7     double-check with you.

8          The officers are available today to proceed,

9     correct?

10          MR. GLYNN:  Yes -- well, the issuing officer,

11     Chanel George (phonetic), is no longer with the agency,

12     but we do have the assistant officer, Officer

13     Abdurraham, who was the decoy officer available to

14     testify today.

15          THE COURT:  Okay.  Thank you.

16          All right.

17          MR. MOSES:  Can you spell the officer's name?

18     Does he appear on the ticket, Counsel?

19          MR. GLYNN:  I'm sorry, I can't hear you, sir.

20          MR. MOSES:  I'm sorry.  Hold on.

21          Can you spell the officer's name and does he

22     appear on the ticket?

23          MR. GLYNN:  I can.  Yes.  It's -- what's -- the

24     spelling of his last name is A-D-U-R-R-A-H-M-A-N [sic].

25          THE COURT:  Mr. Moses, I see the assisting

1    officer's name is indicated on the summons as well so if

2    you would --

3              MR. GLYNN:  Right.

4              THE COURT:  -- want to reference that for the

5    spelling.

6              MR. GLYNN:  Yeah.  First initial K.

7              MR. MOSES:  But -- okay.  We'll have to wait

8    until he gives testimony because I don't know who

9    actually signed the information --

10             MR. GLYNN:  Sir, I can't hear you.  You're

11   going to have to speak up.

12             MR. MOSES:  I don't know who -- my volume is

13   all the way up.  I don't know who actually signed the

14   summons/the information.  We have -- we have a problem

15   with that.  I have a problem with that, so --

16             MR. GLYNN:  Well, the issuing officer is not

17   present, but the assistant officer, who was the decoy

18   officer, is present to testify with respect to the -- to

19   the incident and I think that should be sufficient in

20   going forward with the summons.

21             MR. MOSES:  Right.

22             I disagree with that because the officer who

23   actually signed under penalties of perjury for the --

24   for this summons I believe is not present.  And if

25   that's the case then I don't know how this person could

Case 1:23-cv-03497-PKC-SJB  Document 20-3  Filed 08/24/23  Page 6 of 85 PageID #: 289

1    testify to the document.

2           MR. GLYNN:  Well, the officer who signed the

3    summons is not present, I've already stated that on the

4    record, and the assistant officer, who's the decoy

5    officer who was present during the incident, is the

6    officer who's going to be testifying to the facts that

7    transpired from the incident.  So my -- our position is

8    that -- that's sufficient to go forward on the summons.

9           MR. MOSES:  Right.

10          MR. GLYNN:  The Court will address that.

11          MR. MOSES:  Right.

12          And for the record I disagree and I don't think

13   it's sufficient.

14          THE COURT:  Well, I do find that this -- that

15   would be sufficient because this is the officer that

16   actually spoke with the driver on the date of the

17   incident.

18          That is correct, right, Mr. Glynn?

19          MR. GLYNN:  That is correct, Your Honor.  If

20   anything, he would have more information as to what

21   actually transpired during the stop than perhaps the

22   issuing officer himself.

23          MR. MOSES:  Right.

24          And our position is, number 1, it's facially

25   insufficient.  It fails to state the cause of action for

1    prosecution and the actual issuing officer was not

2    present so it's doubly defective.

3         Now, I don't have an opportunity to

4    cross-examine her, or -- you know, after you give

5    testimony to establish that fact so to me this is

6    absolutely facially deficient.  She was not involved and

7    we could elicit that testimony from the other officer

8    that she was not present yet she signed off under

9    penalties of perjury, okay?  That's hearsay, all right?

10   And that's really improper.  It's an improper issued

11   summons.

12         THE COURT:  All right.  Well, Mr. Moses, just

13   so that you're aware with administrative proceedings

14   hearsay evidence is admissible.  It would be

15   determined -- upon the Court to determine the facts and

16   the issues.

17         And here I do feel that since the assisting

18   officer is present and it's not that TLC wasn't -- you

19   know, they didn't want to produce the issuing officer,

20   the officer is no longer with the department, they're

21   not -- they do not have control over this officer to

22   appear for this hearing and I feel that they did make a

23   sufficient -- you know, right.  Sufficient --

24         MR. MOSES:  For the record, Your Honor, we

25   could have subpoenaed that officer.  You know, we could

1    have -- even if they don't have control they have a

2    last-known address and she might be working for a

3    different department for all we know.  I could have

4    subpoenaed that officer -- gotten -- you know, even --

5    so ordered if she's not with the City anymore.

6              MR. GLYNN:  Your Honor, again, the Commission's

7    position is that the decoy officer, who was actually

8    involved in the interaction with the respondent, is

9    available and ready to testify and I believe that's

10   sufficient to go forward.

11             You know, subpoenas in an administrative

12   proceeding doesn't sound like, you know, something that

13   -- that typically happens and wouldn't be necessary in

14   this matter.

15             So we've already stated our position, we're

16   ready to go forward, I have the officer on standby.

17   Counsel has ample opportunity to cross-examine that

18   officer, and again, we're ready to proceed.

19             THE COURT:  I understand.

20             I just wanted to take a look at the original

21   summons -- original order for the officer.  It doesn't

22   necessarily state that the issuing officer needs to

23   appear.

24             So, I mean, Mr. Moses, I feel comfortable

25   proceeding with today's proceedings with just

1      Officer Abdurraham.

2                MR. MOSES:  Well, I take respectful exception

3      to that for the record.  I believe that it's wholly

4      inappropriate where we have an officer who is not

5      participating state under penalties of perjury the

6      offenses charged, the violation, and as such, you know,

7      that person, you know, impunitive -- and the whole

8      process seems to lack credibility to do it that way.  I

9      mean, what is the purpose of that?  I have no idea.

10               And the other thing that I want to point out is

11     we're going to need to send Your Honor the exhibits, the

12     -- I need the e-mail address of Counsel to e-mail.

13               MR. GLYNN:  Yes.  I can -- I can provide

14     Counsel with my e-mail address.

15               You ready, sir?

16               MR. MOSES:  Yeah.  Go right ahead.

17               MR. GLYNN:  It's Glynn, G-L-Y-N-N, J, as in

18     James, at TLC.NYC.GOV.

19               MR. MOSES:  Okay.

20               Your Honor, and may I please get your e-mail.

21               THE COURT:  Sure.  E-Y-U-N, @OATH.NYC.gov.

22               MR. MOSES:  Okay.

23               All right.  Let me try -- may I do this at this

24     time?  May I submit my exhibits?

25               THE COURT:  Sure.

1           MR. MOSES:  Okay.  Thank you.

2           I submitted them, Your Honor.

3           THE COURT:  Mr. Moses, can you speak up a bit?

4     You were --

5           MR. MOSES:  Yeah.  Sure.  Sure.

6           I'm sorry.  Hold on.  I'm going to redo your

7     e-mail.  O-A-T-H, @NY --

8           THE COURT:  O-A-T-H.NYC.gov.

9           MR. MOSES:  O-A-T -- oh, got it.  O-A-T --

10    hold on.

11          Okay.  So it's E, as in Edward, Y, as in

12    yellow, U, as in umbrella, N, as in Nancy,

13    @OATH.NYC.gov?

14          THE COURT:  Correct.

15          MR. MOSES:  Glynn is G-L-Y-N-N-J; is that

16    correct?

17          Hello, sir?

18          MR. GLYNN:  That's correct.  Yes.  That's

19    correct.

20          MR. MOSES:  Okay.  @TLC.NYC.gov.  Okay.

21          MR. GLYNN:  That's correct.

22          MR. MOSES:  All right.  You should both have it

23    now.  There's four exhibits.

24          THE COURT:  All right.  The Court is in receipt

25    of your exhibits, sir.

1              Mr. Glynn.

2              MR. GLYNN:  Yes, Your Honor.  Just -- if I can

3       have a moment here.

4              Yes, Your Honor.  I have -- I have one --

5       two -- three -- it looks like four exhibits.

6              MR. MOSES:  That is correct.  Four exhibits.

7              THE COURT:  All right.  So let's start with the

8       hearing.

9              The summons number is 73090726A issued to

10      Mr. Matthew Johns represented by Mr. Moses who has put

11      his appearance on the record earlier.

12             Date and time of occurrence is indicated as

13      March 8, 2022, at 8:21 a.m. in front of JFK Airport,

14      Terminal 5, Departures Door 4, JFK, in the borough of

15      Queens, indicates unlicensed vehicle operating for hire.

16      Conviction may result in suspension or revocation of New

17      York State driver's license or vehicle registration.  At

18      above time place of occurrence I observed driver Matthew

19      A. Johns, New York State driver's license number

20      928480686, operating above vehicle bearing New York

21      State plate number JLG6849 at JFK Airport Terminal 5

22      Departures in front of Door 4.

23             While conducting an undercover street hail

24      operation I further observed driver accept a street hail

25      from another undercover TLC officer.  Driver agreed on a

1    destination to 2222 Hempstead Turnpike for a fare of

2    $40.

3              As per TLC records driver and vehicle are not

4    duly licensed to operate for hire.  The driver is also

5    the owner of the vehicle which was used for-hire

6    activity.  As a result your client was issued for a

7    violation of Rule 19-506(b)(1).

8              How does your client plead, Mr. Moses?

9              MR. MOSES:  Not guilty.

10             And also, you know, we take respectful

11   exception once -- ruling based upon what has just been

12   read into evidence.

13             MR. GLYNN:  Your Honor --

14             Sir, I can't hear you.  You're going to have to

15   speak up.  Your --

16             MR. MOSES:  Yeah.  I said that we take -- I'll

17   repeat it.

18             We take respectful exception to the prior

19   ruling based on what has just been read by the

20   administrative law judge.

21             In other words, I want it dismissed based upon

22   you don't have a proper witness.

23             MR. GLYNN:  And, Your Honor, without repeating

24   myself, the -- Your Honor is aware of what the

25   Commission's position is and we feel that there's

1      sufficient information here to go forward and we have

2      the assistant officer ready to testify.

3              MR. MOSES:  All right.  And, Your Honor, please

4      note that I intend on producing a record for appeal so

5      my questions/my voir dire of the officer might be a

6      little lengthy.

7              THE COURT:  Okay.  I'll keep that in mind, sir.

8              MR. MOSES:  Thank you.

9              THE COURT:  All right.  So by pleading not

10     guilty we will proceed with the hearing.  TLC will

11     present their case to me first as they indicated they

12     have the assisting officer who was the undercover

13     officer on the date of this stop present.

14             And, Mr. Moses, will your client be testifying

15     as well?

16             MR. MOSES:  Yes.

17             THE COURT:  Okay.  So let me just swear in

18     Mr. Johns.

19             Mr. Johns or is it Mr. Matthew?  Okay.

20             THE DEFENDANT:  Mr. Matthew Johns.

21             THE COURT:  Matthew Johns.  Okay.

22  M A T T H E W  A.  J O H N S, RESPONDENT, SWORN.

23             THE COURT:  Thank you.

24             All right.  Mr. Glynn, if you want to call your

25     witness.

1          MR. GLYNN:  Yes, Your Honor.  If I can have a

2     moment.

3          Your Honor, I have the Officer on the line.

4          THE COURT:  Officer, can you please state your

5     name and your shield number.

6          OFFICER ABDURRAHAM:  Officer Abdurraham.

7     Shield Number 1142.

8  O F F I C E R  A B D U R R A H A M, WITNESS, SWORN.

9          THE COURT:  Okay.  Mr. Glynn, your witness.

10         MR. GLYNN:  Yes, Your Honor.  Thank you.

11 DIRECT EXAMINATION

12 BY MR. GLYNN:

13    Q  Officer, how long have you been with the New York

14 City Taxi and Limousine Commission?

15    A  Three and a half years.

16    Q  Okay.  And what is your normal tour of duty?

17    A  Right now my normal tour of duty is 700 by

18 1600 hours.

19    Q  Okay.

20         All right.  I'd like to draw your attention to

21 March 8th of 2022 at approximately 8:21 a.m.

22         Do you recall that date and time of where you

23 were?

24    A  Yes.

25    Q  Okay.  And where was that?

Case 1:23-cv-03497-PKC-SJB  Document 20-3  Filed 08/24/23  Page 15 of 85 PageID #: 298

1      A  I was at JFK International Airport doing an

2  undercover street hail operation.

3      Q  Okay.  And was -- what was your tour of duty that

4  day?  Was it the same?

5      A  From 530 to 1430.

6      Q  Okay.  And what, if anything, occurred on that date

7  and time?

8      A  I was hailing undercover in plain clothes anybody who

9  would lower their passenger side window, I'd approach and

10  ask them if they would take me to a certain destination, and

11  if they were to give me a fare I would signal my partner to

12  stop that vehicle.

13      Q  Okay.  And at approximately 8:21 a.m. that morning,

14  did you have any interaction with anyone that you can

15  recall?  Any driver?

16      A  I had approached a vehicle -- I had approached

17  multiple different vehicles that day, but I had approached

18  the vehicle and I asked if he can take me to 2222 Hempstead

19  Turnpike, it's an address I use often, and the driver agreed

20  for a fare of $40.

21      Q  Okay.  Let me just stop you for one moment.

22          The -- the $40 fare, was that something that he

23  suggested or was it something that you suggested?

24      A  I never suggest fare.

25      Q  Okay.

1      A   It's suggested by the operator of the vehicle.

2      Q   Right.

3      A   And once that is confirmed I signal my partner to

4   then stop that vehicle as it is working for hire.

5      Q   Okay.  And were you able to -- was that driver

6   identified?  Do you know who that driver was?

7      A   Before the stop I didn't know who the driver was, but

8   after it was identified as Matthew A. Jones [sic].

9      Q   Okay.  And do you know what -- what the plate number

10  of the vehicle he was driving?

11     A   Yes.  I do.  The plate was -- off my head -- John,

12  Lincoln, George, 6849.

13     Q   Okay.  So just to go back to the conversation you had

14  with the -- with the respondent driver.  Correct me if I'm

15  wrong.

16          You hailed the vehicle and he responded to that

17  hail?

18     A   Yes.  I was curbside Terminal 5 Departure hailing

19  multiple different vehicles, the vehicle then lowered down

20  the window, I had approached it, had a conversation with the

21  driver, asked if he could take me to 2222 Hempstead

22  Turnpike, that's somewhere in Long Island, and the driver

23  suggested a fare of $40.

24     Q   Right.

25          And do you know what side window?  Was it the

Case 1:23-cv-03497-PKC-SJB   Document 20-3   Filed 08/24/23   Page 17 of 85 PageID #: 300

```
 1   front driver's side window or passenger window?
 2       A  Passenger side window.
 3       Q  Right.
 4           And did the -- did that vehicle have any type of
 5   Uber or Lyft stickers on it if you recall?
 6       A  Not that I recall.  No.
 7       Q  Right.
 8           Okay.  And was it later -- was that plate number
 9   later run through any type of system to identify both the
10   owner and what the status of that plate is?
11       A  When -- when the plate -- when we call the plates
12   over into our central communication center it's run through
13   a database called TAMIS, which is a TLC database, and also a
14   DMV database which is from the state to identify the
15   registered owner of the vehicle.
16       Q  Okay.  And what does the TAMIS system tell you about
17   a particular driver or vehicle?
18       A  The TAMIS would show if the driver or vehicle had any
19   past history with the TLC, whether it's a non-licensed
20   entity, or actual driver.
21       Q  Right.
22           And was this particular vehicle -- plate number
23   JLG6849, was it a registered vehicle with the TLC?
24       A  It was not a registered vehicle with the TLC.
25       Q  Right.
```

Case 1:23-cv-03497-PKC-SJB  Document 20-3  Filed 08/24/23  Page 18 of 85 PageID #: 301

1              And the respondent driver, Matthew Johns, is he a

2      licensed TLC driver?  Do you know?

3          A  I don't know if he -- I don't recall if he had any

4      history with the TLC.  His license might have, but at the

5      time he had no current status with TLC.  No.

6          Q  Okay.  Very good.

7              And to your knowledge, were -- were -- was a

8      summons issued to the respondent driver?

9          A  Yes.  One summons was issued, which was 19-506, boy,

10     1, because the driver was the owner of the vehicle.

11         Q  Right.

12             And what you described, the 19-506, boy, 1, that's

13     the rule violation?

14         A  Yes.  That's the rule violation.

15         Q  Right.

16             And do you know which summons was issued to the

17     driver?  The summons number off the top of your head?

18         A  Off the top of my head no.  I don't remember the

19     license.

20         Q  Right.  That's fine.  All right.  That's before the

21     court.

22             MR. GLYNN:  Okay.  I have no further questions

23         at this time, Your Honor.

24             THE COURT:  All right.

25             Mr. Moses, cross.

Case 1:23-cv-03497-PKC-SJB   Document 20-3   Filed 08/24/23   Page 19 of 85 PageID #: 302

1          MR. MOSES:  Yes.

2   CROSS-EXAMINATION

3   BY MR. MOSES:

4     Q  Earlier, Officer, you testified that you would

5   approach anyone and hail them.  You characterized it as

6   hailing.

7          When you first observed Mr. Johns's vehicle did

8   you have any articulable suspicion that he was operating a

9   cab for hire/a car for hire?  Did you have any articulable

10  suspicion?

11    A  I don't recall off the top of my head, but what I do

12  know is I had my hand raised, the driver then lowered the

13  passenger side window down, inviting me to have a

14  conversation which I did.

15    Q  Okay.  And we could agree, can't we, that my client

16  had a liberty interest, correct?  He was free --

17          MR. GLYNN:  Objection, Your Honor.  I mean --

18          (Overlapping speakers.)

19          MR. MOSES:  -- let me --

20          MR. GLYNN:  -- it's not appropriate --

21          MR. MOSES:  -- constitutional law.

22          Let me finish my question, please, Counsel.  I

23      didn't interrupt you.  I could have interrupted you a

24      lot of times.  I didn't.

25          Now --

1          MR. GLYNN:  Sir, I would just ask that you

2      speak up, please.  I can barely hear you.

3  BY MR. MOSES:

4      Q  We could agree, Officer, that my client had a

5  liability interest.

6          Did you observe that he was pulling away from the

7  curb?

8          (Overlapping speakers.)

9          MR. GLYNN:  I'm going to object -- I'm going to

10     object to the question, Your Honor.  It's a compound

11     question.  I'm not too sure what Counsel is asking.

12         MR. MOSES:  Let me -- let me reduce it.

13  BY MR. MOSES:

14     Q  What articulable suspicion did you have that he was a

15  taxi for hire?  That he was a car for hire?

16     A  The moment I had a conversation with him and I asked

17  if he could take me to 2222 Hempstead Turnpike and --

18     Q  Motion to strike the unresponsive portion.

19         From the time before you hailed him did you have

20  any articulable suspicion that he was, in fact, a car that

21  was seeking to pick up a fare?  It's a yes-or-no answer.

22     A  You want a yes-or-no answer to that?

23     Q  I want your --

24         MR. GLYNN:  If the Officer can answer with a

25     yes-or-no answer, Your Honor.

1            Your Honor, I submit that the Officer already

2       responded to that question.  He's already testified.

3            MR. MOSES:  I'm sorry.  I'm waiting for -- you

4       really shouldn't interrupt unless you have an objection.

5       I'm waiting for a response.

6            (Overlapping speakers.)

7            THE COURT:  Everybody give me one second.

8            Mr. Moses, can you please repeat your question.

9            MR. MOSES:  Yes.  Absolutely.

10  BY MR. MOSES:

11   Q   What articulable suspicion did you have that

12  Mr. Johns was a car for hire that could be hailed?  Did you

13  have any articulable suspicion?

14            THE COURT:  Which of the question?  Your first

15       question or the second question?  The first question

16       doesn't seem like it was -- okay.  That does not sound

17       like it calls for a yes-or-no answer.

18            MR. MOSES:  I said it three times, Your Honor.

19            THE COURT:  Okay.  But I'm just saying your

20       question is -- does not call for a yes-or-no response.

21       This is the reason why I asked you to repeat it.

22            So if you could just --

23            MR. MOSES:  Then I'd like a response.

24            THE COURT:  Okay.

25   A   The moment he -- my hail.

1  BY MR. MOSES:

2      Q  The moment -- say that again, please.

3      A  The moment my hail was answered by him rolling down

4  the passenger side window.

5      Q  Okay.  Sir, I'm going to move to strike.  That wasn't

6  the question.

7          Before you hailed him, before, did you have any

8  articulable suspicion to stop my client?  To request him to

9  stop?

10         MR. GLYNN:  I'm going to object, Your Honor.  I

11      think that Counsel is using the word stop incorrect --

12      incorrectly when forming his question.  The stop hasn't

13      taken place at that point.  The Officer was hailing the

14      respondent.

15         THE COURT:  Mr. Moses, are you able to rephrase

16      that question?

17         MR. MOSES:  Yes.  Yes.

18  BY MR. MOSES:

19     Q  Did you have any articulable suspicion that would

20  lead you to believe that he -- that -- to hail him for a

21  ride for money?

22     A  With all due respect, Counsel, I don't understand

23  your question.

24         You're asking me --

25     Q  All right.  Then if you don't understand it --

1    When you were trained, did they ever train you

2    that before you do a stop you have to have articulable

3    suspicion before you --

4    A   Counsel, I think you're not -- Counsel, I don't think

5    you're understanding.  He wasn't stopped.  He chose to talk

6    to me which gave reason for the stop because I had a

7    conversation with him and he agreed to take me to point A to

8    point B for a fare of $40.  That's when the vehicle was

9    stopped because then he is now violating

10   Rule 19-506, boy, 1.

11   Q   Move -- move to strike as non-responsive.  Move to

12   strike as non-responsive.

13        (Overlapping speakers.)

14   Q   This is a simple question and we're not going to be

15   able to move forward until you answer the question.

16        Isn't it true you had no reason that you were

17   stopping anyone that day?  Isn't that your testimony

18   earlier --

19        MR. GLYNN:  Objection.

20   Q   -- anyone -- trying to stop -- hail anyone that day?

21        MR. GLYNN:  Objection.

22        THE COURT:  Mr. Moses, when you refer to the

23        word stop are you talking about when the stop -- when

24        the officers executed the stop as in when they start

25        with their process of issuing the -- is that what you're

1   referring to?  I think that's what the confusion --

2          MR. MOSES:  I'm talking -- I'm talking common

3   sense.  I'm talking stopping people that are pulling

4   away and then asking them in a desperate way for a lift.

5          THE COURT:  All right.

6          (Overlapping speakers.)

7          THE COURT:  Hold on one second.

8          MR. MOSES:  If he was stopping anyone -- he

9   couldn't have had articulable suspicion.  That was --

10          THE COURT:  Mr. Moses -- Mr. Moses, the Officer

11   testified that the respondent stopped for the Officer

12   and lowered his window.  He never said that he stopped

13   him.  That was the testimony.  So if you keep asking him

14   questions about something he didn't testify to, I'm not

15   sure what kind of answer you expect to get which is why

16   I'm asking you to rephrase the question.

17          MR. MOSES:  Your Honor, with all due respect --

18   with all due respect, nobody just stops, okay?  My

19   client will testify that his hour light was on and he

20   was pulling away from the curb, okay?

21          THE COURT:  Okay.  Well, you know, he can

22   testify when it's his turn.  Right now it's your turn to

23   question the Officer as to his testimony, right?  So,

24   you know, if we can just proceed.

25          MR. MOSES:  But it's obvious that he's a

BEE REPORTING AGENCY, INC.  (516) 485-2222

1    noncooperative witness.

2              MR. GLYNN:  Objection.

3              MR. MOSES:  To me --

4              MR. GLYNN:  I'm going to object -- I'm going to

5        object to that mischaracterization of the Officer.

6              MR. MOSES:  He's absolutely a noncooperative --

7        you can object all you want.  We have a record that --

8              MR. GLYNN:  And I will.

9              MR. MOSES:  -- to the appellate decision as far

10       as I'm concerned.

11             MR. GLYNN:  Yes.  Very good.  Objection.  Move

12       on.

13             THE COURT:  Let's move forward.

14   BY MR. MOSES:

15       Q  Next question.

16             Sir, do you understand what the term articulable

17   suspicion means?

18             MR. GLYNN:  Your Honor, I'm going to object to

19       that question.  I mean --

20             MR. MOSES:  You know --

21             MR. GLYNN:  -- Counsel can certainly question

22       the witness, but this is not a law school class.

23             MR. MOSES:  He has to answer the question.  He

24       can't object and prevent his client from answering.  His

25       client is continuing to go silent when he objects.

1            MR. GLYNN:  Yes.  Because the Court has to rule

2     as to my objection.  The witness has been instructed to

3     allow the Court to rule on any objections that are made.

4            THE COURT:  All right.  I think --

5            (Overlapping speakers.)

6            THE COURT:  Have the Officer answer.  It's a

7     yes-or-no question, but I hope this is going somewhere,

8     right, Mr. Moses?

9            MR. MOSES:  It's absolutely going somewhere.

10            THE COURT:  All right.  So, Officer, it's a

11     simple question.

12            So, Mr. Moses, if you can just repeat the

13     question.  It's a yes-or-no answer.

14            Go ahead.

15            MR. MOSES:  Foundation.

16  BY MR. MOSES:

17     Q   The question is, do you understand what articulable

18  suspicion means in the context of your employment?

19     A   Please explain it to me.

20            THE COURT:  It's just yes or no, Officer.

21     A   No.

22     Q   That was no.

23            Is that -- did I hear correctly?

24     A   Yes.

25     Q   Okay.  And have you ever -- have you ever heard the

1  term articulable suspicion?

2     A  I have.

3     Q  And what does it mean then if you've heard the term?

4     A  Articulable -- a way where I can explain a reason

5  as -- which would raise my awareness to have a certain

6  belief.

7     Q  Okay.  Did you have any reason to believe that my

8  client would be someone from your observation who was

9  seeking to hail a fare before -- before you tapped on his

10 window?

11    A  Excuse --

12          MR. GLYNN:  Yeah.  Your Honor, I'm going to

13    object.  The witness didn't testify that there was any

14    tapping on the window.  A mischaracterization of his

15    testimony.

16    A  I never tapped the window.

17          MR. JOHNS:  That is what exactly happened.  He

18    lied.

19    A  I never tapped the window.

20          THE COURT:  All right.  I didn't hear any

21    testimony regarding tapping of a window here.

22          So, Mr. Moses, if you can just stick to what

23    the officer testified to.

24 BY MR. MOSES:

25    Q  Well, Officer, you understand the question?  You can

1  remove the part about tapping on the window, but you

2  understand the question now, don't you?

3      A  Can you repeat the question without putting in

4  tapping on the window?

5      Q  Yeah.  Yeah.  Of course.

6          In terms of articulable suspicion to Mr. Johns as

7  the operator of a vehicle at the time you first observed him

8  did you have -- did you have articulable suspicion to

9  believe that he would be seeking to obtain a fare?

10     A  Before he answered my hail no.

11     Q  No.  Thank you.

12         And now my next question is the following, do you

13  -- do you recall if at the time you first observed he was

14  pulling away from the curb?

15     A  No.

16     Q  Do you recall if he had his hour light on?

17     A  His what light?

18     Q  Hour light.  Blinker.  Directional signal.

19     A  No.  I don't recall.  I was on the curbside.  I

20  wasn't in the middle of the street.

21     Q  Now, when -- isn't it true that when you stopped him

22  he was already pulling away from the curb?

23     A  In all due respect, Counsel, I didn't stop him.  He

24  stopped -- he stopped himself and -- he was already stopped.

25  He lowered his window and talked to me.  I didn't stop him.

1   He was free to go at any given time before he answered my

2   hail.  He answered my hail, rolled down his window, and gave

3   me a price to go from point A to point B.

4       Q   Now, did you go through an academy before you became

5   a TLC officer?

6       A   Yes.  I did.

7       Q   And do you have -- do you have peace officer status?

8       A   I do have peace officer status.  Yes.

9       Q   How long was your training at the academy?

10      A   Six months.

11      Q   Did your training include constitutional rights?

12              MR. GLYNN:  Objection, Your Honor.

13              I don't know where Counsel is going with this.

14      I mean, it's clearly beyond the scope of my direct and I

15      don't see how this is even relevant to the proceedings.

16              MR. MOSES:  Well, I think it's very relevant

17      and I could -- you know, my foundation is related to the

18      constitutional rights of depravation by this Officer to

19      my client and many other people actually so that's my

20      foundation.  That's the reason I'm asking the question.

21              THE COURT:  All right.  I'll allow this

22      question, but I'm going to ask, Mr. Moses, please move

23      along.

24   BY MR. MOSES:

25      Q   Officer, did they train you in constitution -- in the

1    constitution?

2        A  Yes, Counsel.

3            But in all due respect I don't see how his

4    constitutional rights were violated if I never stopped him

5    from leaving.  He chose to have a conversation with me.

6        Q  My next question is --

7            THE COURT:  Okay.  Before we proceed further,

8        one second, Mr. Moses, I'm going to ask you to control

9        the respondent.  I hear him laughing and I do not feel

10       this is -- this hearing procedure.

11           If you would like to be put on mute, we can do

12       whatever you want, Mr. Johns, but this is very improper

13       and I do not appreciate that.

14           MR. JOHNS:  Okay.  I'm sorry about that.

15           THE COURT:  Please proceed, Mr. Moses.

16           MR. MOSES:  Okay.

17   BY MR. MOSES:

18       Q  The person who trained you in -- at the academy in

19   constitutional law, was that a captain or someone higher?

20           MR. GLYNN:  Your Honor, I think the Officer has

21       already responded generally to Counsel's questions and I

22       think we're going down a road that has no relevance to

23       the subject matter of this proceeding and the summons

24       before the Court.  We're going to be here all day on

25       officer training.  I don't see how that really assists

1    us in this matter.

2          MR. MOSES:  I've already stated the reason for

3    adding foundation to these questions.  I have a very

4    uncooperative witness here and I'm asking --

5          MR. GLYNN:  I'm going to object to that

6    characterization of the officer.

7          THE COURT:  Okay.  So I agree, Mr. Glynn.  I

8    don't think that's a fair characterization.

9          MR. GLYNN:  Especially when he has his -- his

10    client in the background giggling.

11          THE COURT:  That I have already addressed on

12    the record.

13          Mr. Moses, how much foundation would you need

14    to get to your point because this is getting a little

15    bit repetitive going back.

16          MR. MOSES:  I'm trying to establish the pattern

17    and practice and the policy of the TLC.  It's that

18    simple.  I have every right to do so under

19    42 U.S.C. 1983.

20          THE COURT:  All right.  Like I said, I will let

21    you --

22          MR. MOSES:  Under deprivation of constitutional

23    rights by someone acting under color of state law, okay,

24    who's a peace officer.

25          MR. GLYNN:  I think Counsel is in the wrong

1     form for this.

2             Counsel, if you want to argue constitutional

3     law I think you're in the wrong form.  This is an

4     administrative proceeding.  I'm not too sure where, you

5     know, this all fits into a unlicensed vehicle

6     operating-for-hire proceeding.

7             MR. MOSES:  Right.  All right.  But please

8     don't direct questions to me, direct them to the

9     Judge --

10            MR. GLYNN:  That was --

11            MR. MOSES:  -- administrative remedies.

12            THE COURT:  Okay.  Mr. Moses, I'm going to ask

13    you again to please move along.  I did allow the

14    foundation questions, but it's becoming -- yeah.  I

15    would like to see the point as well.  If you can do it

16    within the next couple minutes.

17            MR. MOSES:  Your Honor, the only thing I could

18    do is restate question.  If I'm not permitted to ask the

19    question I want a record.

20 BY MR. MOSES:

21    Q  My question was, who trained you in constitutional

22 rights?  Was it a captain or someone above?  I have a

23 follow-up question in that regard.

24            THE COURT:  All right.  So let's just answer

25    this question and the follow-up and then let's get back

 1          to the point.
 2                   All right.  So, Officer, if you can answer that
 3          please go ahead.
 4          A  An instructor of the training academy.
 5   BY MR. MOSES:
 6          Q  Was that instructor a person of rank?
 7          A  I don't recall.
 8          Q  Did you receive a handout or bulletin regarding your
 9   training?
10          A  Yes.
11          Q  And did that include policy related to constitutional
12   law?
13                   MR. GLYNN:  I would object, Your Honor.
14          Counsel continues to go down a road that's not relevant
15          to the proceeding at hand.
16                   THE COURT:  Mr. Moses, if you can --
17                   MR. MOSES:  I want to know who created the
18          policy.
19   BY MR. MOSES:
20          Q  Who created this specific policy that you --
21                   THE COURT:  If you know.  Okay.  If the Officer
22          knows the responses to any of these questions it appears
23          that at this point he doesn't recall most of this,
24          but --
25          A  I don't know.

1      Q  He doesn't know.  That was his answer.

2          Officer, what was the first thing you said to my

3   client when he rolled -- when you said he rolled down his

4   window?  What did you tell him?

5      A  I'm trying to get to -- I state my location I'm

6   trying to go.  Can you take me.

7      Q  What was his response to you?

8      A  I -- the driver of the vehicle agreed and gave me a

9   fare which was $40.

10     Q  But what -- the question withdrawn.

11         Are you referring to a memo book now?

12     A  I am not referring to any memo book.  No.

13     Q  And from your memory can you -- can you tell me the

14  words that he used in response to your first question?

15     A  I cannot give you something verbatim that was that

16  long ago.  No.

17         But what I can tell you is he agreed to take me to

18  my destination for a fare.

19     Q  Do you recall any other statements you made to him?

20     A  I don't recall any other statements.  No.

21     Q  Do you recall any other statement that he made to

22  you?

23     A  No.

24     Q  Is it your practice to create a memo of these stops?

25  A memo book?

1      A   Yes.

2      Q   And do you have such a memo book?

3      A   I do have a memo book.  Yes.

4      Q   Do you have it today?

5      A   I don't have it on me right now.  No.

6      Q   Was there any other officers involved in this process

7   of issuing the summons?

8      A   The issuing officer.  Yes.

9      Q   The issuing officer, what was her name?

10      A   Officer George.

11      Q   Where is Officer George today?

12      A   Officer George is no longer with the agency.

13      Q   Is there a reason that you know of she's no longer

14   with the agency?

15              MR. GLYNN:  Objection.

16              THE COURT:  Yeah.  Please move on, Mr. Moses.

17      I don't think that's a necessary question.

18   BY MR. MOSES:

19      Q   Do you have a copy of the summons in front of you,

20   Officer?

21      A   No.  I don't have a copy of it in front of me.

22      Q   Are you the one who signed the summons under

23   penalties of perjury?

24      A   My name is the assisting officer, but the issuing

25   officer has the signature on there.

1    Q  Isn't it true that the issuing officer was not

2  present when you were speaking to Mr. Johns?

3    A  The issuing officer was curbside watching me.

4    Q  How far away was the issuing officer at the time?

5    A  I don't recall, but she was close by to be able to

6  see me and maintain visual without having any obstruction

7  and wait for my sign.

8    Q  Isn't it true -- isn't it true that you then returned

9  to her and you told her what happened?

10    A  Yes.

11    Q  Isn't it true that she couldn't hear that

12  conversation that took place between you and my client?

13          MR. GLYNN:  Well, Your Honor, I'm going to

14       object because the Officer would not know that

15       specifically.  That would be a question for the issuing

16       officer herself.

17          MR. MOSES:  Your Honor, I believe that's --

18       that's a very fair question that could be answered.

19          THE COURT:  Can you repeat the question,

20       Mr. Moses.

21          MR. MOSES:  Yeah.

22  BY MR. MOSES:

23    Q  The question is, isn't it true that the issuing

24  officer could not hear your conversation?

25    A  The issuing officer --

1                THE COURT:  If you -- I think that may be --

2        A  You would have to ask --

3           Hello?

4        Q  Go ahead.

5        A  Hello?

6           You would have to ask her, but what the summons

7     says I stand on the base of it.  I confirmed with her what

8     the driver said and that is what happened.

9        Q  Was she -- Officer, was she in uniform or out of

10    uniform?

11       A  Everyone was in plain clothes.

12       Q  Do you recall what my client looked like?

13       A  No.  I don't recall what your client looks like.  No.

14    I interact with many people every single day.  I do not

15    recall what your client looks like.

16                MR. MOSES:  Your Honor, I want to reserve my

17           rights for some follow-up questions, but I'd like to

18           call my client as a witness at this time.

19                THE COURT:  All right.

20                MR. GLYNN:  So -- I just want to make sure I'm

21           clear here, Your Honor.

22                So is --

23                THE COURT:  Yes.

24                MR. GLYNN:  -- Counsel finished with his cross

25           on the witness at this point --

1      MR. MOSES:  Yeah, but I'm reserving --

2      MR. GLYNN:  -- and that he has client

3   testifying at this time?

4      THE COURT:  Correct.

5      MR. MOSES:  Yeah.  But I'm reserving my right

6   to call him as a witness -- as a direct witness.

7      MR. GLYNN:  I don't believe you can do that.

8      MR. MOSES:  Counsel --

9      MR. GLYNN:  He's a witness for the Commission.

10   He's not your witness.  If you have some additional

11   questions, that's one thing, but you -- you know, it's

12   our position that you cannot call him as a direct

13   witness on your case.

14      MR. MOSES:  Well, based on my client's

15   evidentiary testimony I reserve my right to call him as

16   a witness.  If you're denying that then, you know, let's

17   make a record.  You're --

18      MR. GLYNN:  Well, I would be objecting to that.

19   I don't believe you're in a position to do that.  I

20   mean, if you have additional questions certainly that's

21   something the Court can grant you leave to do.

22      THE COURT:  All right.  So you're just

23   indicating that you may have some follow-up questions;

24   is that correct?

25      MR. MOSES:  Yes, Your Honor.  That is correct.

1          THE COURT:  Okay.  And, Mr. Glynn, right now

2     actually before we even get to Mr. Johns do you have any

3     redirect for the Officer?

4          MR. GLYNN:  I do have a couple of questions,

5     Your Honor, if I may.

6          THE COURT:  All right.  Yes.

7          MR. GLYNN:  Okay.

8   REDIRECT EXAMINATION

9   BY MR. GLYNN:

10    Q  So, Officer, if -- it's your testimony that -- that

11   the issue officer was standing at a distance where she could

12   see your interaction with the respondent driver; is that

13   correct?

14    A  Yes.

15    Q  Okay.  And after you had the -- well, this will go

16   back to the stop itself.

17          You were hailing vehicles at that location, at JFK

18   Airport Terminal 5 Departures, correct?

19    A  Yes.

20    Q  And the respondent driver was one of the vehicles

21   that responded to your hail?

22    A  Yes.

23    Q  Okay.  And when I say respond, I just want to make

24   sure that we're clear about this.

25          Did he drive his vehicle towards you in response

Case 1:23-cv-03497-PKC-SJB   Document 20-3   Filed 08/24/23   Page 40 of 85 PageID #: 323

1    to your hail?

2       A   I don't recall, but I know that when the vehicle was

3    lowered -- if the vehicle wasn't in motion I would have

4    moved away.  I would have not felt safe.

5       Q   Okay.  When you said that he responded to your hail,

6    did he -- did he lower his -- the vehicle's windows to speak

7    to you directly?

8       A   Looked my way and lowered the passenger side window.

9            MR. MOSES:  Objection.  These are leading

10       questions.

11           MR. GLYNN:  This is -- this would be redirect,

12       Your Honor.  I think I have some leeway.

13           THE COURT:  Yeah.  Go ahead.  Let's just move

14       on.

15           MR. GLYNN:  Okay.

16   BY MR. GLYNN:

17      Q   And it was after the respondent lowered his window

18   that you had this verbal discussion with him, correct?

19           MR. MOSES:  Objection.  Leading.

20      A   The front side window was.

21      Q   Right.

22           He lowered that and then you had a conversation

23   with the respondent driver?

24      A   Yes.

25           MR. MOSES:  Objection.

1      A  I had a conversation.

2      Q  All right.  And it was at that time that you gave him

3  what your intended destination was?

4      A  Yes.  2222 Hempstead Turnpike.

5              MR. MOSES:  Objection.  Leading.  Motion to

6         strike.

7              THE COURT:  Mr. Glynn, please rephrase the

8         question.

9              MR. GLYNN:  Right.  That's fine.

10             THE COURT:  Okay.

11  BY MR. GLYNN:

12     Q  Did you tell the driver -- respondent driver where

13  you wished to go?

14     A  Yes.

15     Q  Okay.  And that was where?

16     A  2222 Hempstead Turnpike.

17     Q  Right.

18         And with respect to the discussion about a fare,

19  who raised that?

20     A  The driver.

21     Q  Okay.  And do you recall what the fare amount that

22  was mentioned by the driver?

23     A  40.

24     Q  Right.

25         Okay.  And after that got -- after that engagement

1  then what happened?

2      A  I signaled for my partner to come over and stop the

3  vehicle because at that point he's violating

4  Rule 19-506, boy, 1.

5      Q  Right.

6          And is it correct to say it's your understanding

7  that the stop took place after you had the conversation with

8  your -- with the other TLC enforcement officers?

9              MR. MOSES:  Objection.  That's not the prior

10        testimony and it's leading.

11             MR. GLYNN:  I believe the Officer already

12        testified to that.

13             THE COURT:  Yeah.  I believe he has as well,

14        Mr. Moses.

15             MR. GLYNN:  Yes.  Okay.

16  BY MR. GLYNN:

17      Q  So is that correct, Officer, that the stop took place

18  after you spoke to the -- to Officer George and explained

19  what had transpired between you and the respondent driver?

20      A  No.  Once I give the signal that's means that there

21  was confirmation of a trip and a fare was given by the

22  driver, my partners would stop that vehicle, ascertain

23  information from the driver, then come to me and ask what

24  happened, I explain what happened, and tell them the

25  criteria and information behind why he violated the rule,

1    and then they issue the summons.

2        Q   Okay.  I see.

3            Okay.  And does the -- if you know, does the

4    respondent -- once you walk away from the subject vehicle in

5    this instance with the respondent driver, do you know if he

6    knows whether you were ever a -- does he know that you're a

7    TLC officer or not?

8        A   I maintain my cover and I either walk away, or I go

9    inside the terminal, or I go back to our vehicle.

10       Q   Okay.  I see.

11               MR. MOSES:  May I redirect, please?

12       Q   All right.  And just to go back.  Counsel had asked

13   you about your memo book entry.

14       A   Yes.

15       Q   Okay.  What, if anything -- well, in this instance do

16   you recall what that entry would have -- would have laid or

17   would have stated?

18       A   It would have said undercover street hail and then

19   probably the plate.

20               MR. MOSES:  Objection.  Calls for speculation,

21       Your Honor.  Move to strike his testimony.

22               MR. GLYNN:  Okay.

23               MR. MOSES:  This is --

24               THE COURT:  Mr. Moses, we can hardly hear you.

25       If you can just --

1          MR. MOSES:  I move to strike this testimony.

2     It calls for -- it calls for speculation.  It's not used

3     to refresh recollection.  It was never document

4     exchanged so he cannot testify.

5          MR. GLYNN:  Well, Counsel already asked the

6     Officer about his memo book entries so I'm just

7     following up with a couple of questions.  I'll rephrase

8     my question.

9  BY MR. GLYNN:

10    Q  Typically, Officer, when you make a memo book entry

11  what kind of information do you put in?

12    A  Driver information on whatever happened.  Driver

13  information.  Vehicle information.  Fare associated.

14    Q  Okay.  And that's the extent of the entry; is that

15  correct?

16    A  Yes.

17          MR. MOSES:  Objection.  Leading.

18    Q  Is that the extent of the entry?  I'll rephrase it.

19    A  Yes.

20    Q  Thank you.

21          MR. MOSES:  Motion to strike.  Lacks

22     credibility.

23          My I now go ahead and ask my follow up?

24          MR. GLYNN:  I'm sorry, what was Counsel's basis

25     for his objections?

1          MR. MOSES:  It lacks credibility.

2          MR. GLYNN:  Your Honor, I'm submitting to the

3     Court that his objection doesn't -- it doesn't have a

4     proper basis.  It lacks credibility?  What kind of

5     objection is that?

6          MR. MOSES:  Because he's testifying --

7          MR. GLYNN:  I mean, the Court can certainly

8     weigh the Officer's credibility, but I've never heard of

9     an objection based on lacks credibility.

10          MR. MOSES:  The document is not in evidence.

11     It calls for speculation.  Never exchanged.

12          THE COURT:  Okay.

13          (Overlapping speakers.)

14          MR. MOSES:  -- you should have exchanged it.

15          THE COURT:  All right.  Objection is overruled.

16          (Overlapping speakers.)

17          THE COURT:  -- and credibility obviously will

18     be determined by the Court.

19              So let's move on here.

20          MR. GLYNN:  Thank you, Your Honor.

21          (Overlapping speakers.)

22          THE COURT:  Mr. Glynn, are you finished with

23     your redirect?

24          MR. GLYNN:  Just give me one moment, Your

25     Honor.

1           THE COURT:  Okay.  Mr. Moses, let Mr. Glynn

2      finish before we go back to you, okay, please?

3           MR. GLYNN:  I have no further questions, Your

4      Honor.

5           THE COURT:  Okay.

6           So, Mr. Moses, you're indicating you have some

7      additional based on what Mr. Glynn -- on Mr. Glynn's

8      redirect, correct?

9           MR. MOSES:  Yes.

10          THE COURT:  Please keep it short.

11          MR. MOSES:  Yes.

12  RECROSS EXAMINATION

13  BY MR. MOSES:

14     Q  The issuing officer, was that a man or a woman?

15          MR. GLYNN:  Objection.

16     A  A man or woman?

17     Q  Was that a male or a female?

18     A  It was a female.

19     Q  Okay.  I'm just trying to clear up the record.  Early

20  in the testimony it was a male.

21          The next --

22          MR. GLYNN:  No.

23     Q  -- question --

24          MR. GLYNN:  That was not the testimony.

25          Your Honor, the Officer never testified that

1      the -- that the issuing officer was a male.

2              THE COURT:  Yeah.  I didn't hear that testimony

3      either.

4              MR. MOSES:  That was how you framed your

5      question, Counsel.

6  BY MR. MOSES:

7      Q  My next question is, how far away was she from your

8  -- from being present from you when you engaged my client?

9  How many feet?

10             MR. GLYNN:  It's been asked and answered.  I'm

11     going to object, Your Honor.  Asked and answered.  The

12     Officer testified that he couldn't recall specifically

13     how many feet away the issuing officer was.

14             THE COURT:  Correct.  I do recall that.

15             All right.  Mr. Moses --

16             (Overlapping speakers.)

17  BY MR. MOSES:

18     Q  Officer, I have one more question for you.

19             You repeatedly said that my client agreed to $40.

20             MR. GLYNN:  Objection.  Mischaracterization of

21     the testimony.  The Officer never testified that the

22     respondent agreed to $40.  In fact, I believe the

23     testimony was that the respondent driver proposed a

24     $40 fare.

25  BY MR. MOSES:

Case 1:23-cv-03497-PKC-SJB   Document 20-3   Filed 08/24/23   Page 48 of 85 PageID #: 331

1     Q  Okay.  Officer, what was it?  Was it proposed by my

2  client?  Is that your testimony?

3     A  The fare was proposed by the driver of the vehicle.

4  I never give price.

5     Q  Isn't it true my client said to you that he never

6  offered a specific amount?

7          Did you suggest an amount to my client?

8     A  I did not suggest an amount.  No.

9          MR. GLYNN:  Your Honor, I'm going to object to

10     the form of the question.  It's somewhat confusing.  I'm

11     not too sure what Counsel -- Counsel has made a couple

12     of statements during the course so I'm not too sure what

13     he --

14          MR. MOSES:  I'm going on to my next question,

15     Counsel.  You keep interpreting.  It's incredibly --

16          MR. GLYNN:  Well, Counsel, frame your questions

17     properly.

18          OFFICER ABDURRAHAM:  I thought it was one more

19     question.

20          MR. MOSES:  It's an incredible record of your

21     interruptions.

22          THE COURT:  All right.  So, Mr. Moses, you said

23     you have one more question.  Go ahead.

24          MR. MOSES:  Yeah.  I do have one more question.

25          THE COURT:  All right.  Last question.

 1   BY MR. MOSES:

 2      Q   Isn't it true, Officer, that you testified that you

 3   don't recall specifically things that my client told you?

 4   Didn't you say that earlier?  You didn't recall?

 5      A   Specific verbatim things no, but --

 6             MR. MOSES:  Your Honor, no further questions.

 7      I have no further questions of this witness.

 8             THE COURT:  All right.  No further questions.

 9             Officer, you're free to go.

10             OFFICER ABDURRAHAM:  Thank you, ma'am.

11             THE COURT:  Mr. Glynn, would you like to let

12      your witness go?

13             MR. GLYNN:  Yes.

14             Officer, thank you very much.

15             OFFICER ABDURRAHAM:  Thank you, Counsel.  Thank

16      you, Judge.

17             MR. MOSES:  You have a nice day.

18             THE COURT:  All right.  So, Mr. Moses, we can

19      -- if you'd like to have your client testify at this

20      time please do so.

21             MR. MOSES:  Yes.  I would like to do that,

22      please.

23             THE COURT:  Okay.

24             And, Mr. Johns, I'm just going to quickly

25      remind you that you are under oath.

1              Please go ahead.

2    DIRECT EXAMINATION

3    BY MR. MOSES:

4       Q  Mr. Johns, where do you live?

5              Mr. Johns, where do you live?

6       A  I live in Hempstead.  That's 451 Fulton Avenue.

7              MR. GLYNN:  Your Honor, I'm sorry.  I can't

8         make out the respondent at all.  If he could just speak

9         louder, please.

10      Q  Could you turn up the volume on your phone,

11   Mr. Johns.

12      A  My volume is turned up and I'm speaking very loud so

13   I'm not exactly sure why you can't hear me.

14             THE COURT:  Well, I can't hear you very well

15        either, Mr. Johns.  I'm not sure if you are on speaker

16        if you can come up a bit.

17             MR. JOHNS:  All right.  Hold on.  Let me take

18        it off speaker.

19             THE COURT:  All right.  Thank you.

20      A  So the answer to the question as to where I live, I

21   live at 451 Fulton Avenue in Hempstead.

22   BY MR. MOSES:

23      Q  Okay.  I'd like to have marked for purposes of

24   examination the pay stubs showing employment of my client.

25             (RESPONDENT'S Exhibit 1 was marked for

1   identification and retained by counsel.)

2      Q  Mr. Johns, do you have these exhibits in front of you

3   still?

4      A  No.  I didn't bring my pay stub.

5      Q  Okay.  Would I be able to send these to you at this

6   time?

7      A  You can send it to my e-mail.  I could pull it up.

8      Q  Okay.  Wonderful.

9      A  Let me see if I can -- I'm actually in the office

10  right now.

11     Q  Okay.  No problem.

12          One moment.  It's taking a little while to copy

13  these to --

14          Mr. Johns?

15     A  Hello?

16     Q  I just sent you the e-mail.  Let me know when it

17  arrives, please.

18     A  Let me check.  Hold on.

19          Yes.  I have it.

20     Q  Great.

21          Now, I'd like you to look at what's labeled, pay

22  stub showing employment.

23          Could you open that document, please.

24     A  Okay.  Document -- the document is open.

25     Q  Okay.  What is that document?

1      A   It's a pay receipt for my employment.

2      Q   And what do you do for a living?

3      A   I'm a sales support coordinator.

4      Q   Where are you a sales support coordinator?

5      A   Altice USA.

6      Q   What does that company do?

7      A   We are in the communication business so we are

8   provider for telephone, internet, and cable.

9      Q   And what does a sales support person like yourself do

10  for Altice?

11     A   It's administrative work where I do basically for the

12  company compliance.  Mainly focus on company -- the company

13  -- such as the -- the sales representative.

14     Q   And how long have you done that for?

15     A   Approximately 13 years.

16           MR. GLYNN:  I'm sorry, I couldn't hear that?

17           MR. JOHNS:  Approximately 13 years.

18           MR. GLYNN:  13 years?

19           THE WITNESS:  One, three years.

20           MR. GLYNN:  Okay.  Thank you.

21  BY MR. MOSES:

22     Q   And looking at this document I see it's labeled,

23  earning statement.

24           What is this document?

25     A   It is a pay stub that shows what I earn, the taxes I

1   paid, et cetera.

2       Q   Is this a pay stub from your current place of

3   employment where you've been for 13 years?

4       A   That is correct.

5           MR. MOSES:  Your Honor, I'd like to move this

6       in as Respondent's Exhibit 1.

7           MR. GLYNN:  And I have some questions for the

8       respondent with respect to this document, Your Honor.

9           THE COURT:  All right.

10          (RESPONDENT'S Exhibit 1 was admitted into

11  evidence.)

12          THE COURT:  You will have your chance later on.

13          Please go ahead, Mr. Moses.

14  BY MR. MOSES:

15      Q   Now, apparently you testified -- you just testified

16  that you have been employed with this company for 13 years?

17      A   Approximately.

18      Q   In the last 13 years or at any time have you ever

19  operated a taxi?

20      A   No.

21      Q   Have you ever operated an Uber car?

22      A   No.

23      Q   Have you ever thought to go out as an unlicensed

24  operator of a taxi or a limousine to hail people for money?

25      A   No.

1      Q  Has the car -- that's -- is this car registered

2  that -- that the summons was issued to you, was that

3  registered to you?

4      A  Yes, it is.

5      Q  Has that car ever been used for an illegal hail?

6      A  No.

7      Q  Okay.

8              MR. MOSES:  Your Honor, may I please go on to

9      ask direct questions of my client?

10             THE COURT:  Go ahead.

11  BY MR. MOSES:

12     Q  Now, on the day that you were issued this summons,

13  it's listed at March 8, 2022, where did you leave from to go

14  to JFK?

15     A  I leave directly from my home.  I had a friend -- a

16  couple of friends visited me and was going back to Jamaica.

17  So I took them to the airport before I actually get ready

18  for work and I took him to stop at the terminal, let them

19  out of the vehicle, and was heading back home.

20     Q  I see.

21             Did you ask your friends for proof that he was

22  dropped off that day?

23     A  I did send -- ask him to send me something that

24  showed I dropped them at the airport.

25     Q  Right.

1          Well, I'd like you to open up the exhibit that

2   says, JetBlue reservation.

3               (RESPONDENT'S Exhibit 2 was marked for

4   identification.)

5       A   Hold one moment.  Let me -- because I'm using my

6   phone so I have to put you back on speaker to go to the

7   e-mail.

8               I think there is only one attachment with -- oh,

9   yeah.  Sorry.  Go ahead.  Yes.

10      Q   Is that the -- for purposes of examination as

11  Respondent's Exhibit 2, is that the document that you

12  received from your friend?

13      A   Yes.

14      Q   What does this document indicate?

15      A   It indicates that they have a flight on that day

16  where I dropped them.

17      Q   And was he inbound for Kingston?

18      A   Yes.

19      Q   Did you have any other reason to go to the airport

20  that day?

21      A   I had no absolutely no other reason to go to the

22  airport.  No.  I only go to the airport when I'm dropping

23  somebody or I'm picking somebody up.  I have no other reason

24  to be out there.  I live on Long Island.  That's all the way

25  in Queens.

1          MR. MOSES:  Your Honor, I'd like to move this

2      document into evidence as Respondent's Number 2.

3          THE COURT:  Okay.

4          (RESPONDENT'S Exhibit 2 was admitted into

5  evidence.)

6  BY MR. MOSES:

7    Q  Now, when you dropped your friends off what happened

8  then?

9    A  Okay.  So on that day when I dropped them off they

10 were running -- actually -- so they came out of the car,

11 both of them, and as they came out we waived goodbye.

12         I put my indicater on and was pulling out when I

13 suddenly hear a load tap on my window -- my passenger

14 window.  So I put my foot on the brake and looked.  I rolled

15 my window down slightly, not all the way down.

16         I said, what I can do for you?

17         And he said, I'm trying -- do you know what the

18 fare to go to Hempstead Turnpike?

19         I said, I do not know.  Have you asked anybody out

20 there?

21         He said, no.  He's just trying to get his wife --

22 his wife was pregnant and he's stuck and he's trying to get

23 there.

24         I said, well, you can get on the Uber app or

25 something.

           BEE REPORTING AGENCY, INC.  (516) 485-2222

Case 1:23-cv-03497-PKC-SJB   Document 20-3   Filed 08/24/23   Page 57 of 85 PageID #: 340

1          He said he does not have the Uber app.

2          I said, can any -- you ask anybody to assist you

3     or anything?

4          And he put on -- and he started to put on a whole

5     conversation about what that means and every suggestion I

6     gave him he doesn't have that, right?

7          Then he goes his wife is pregnant and he's out

8     there.

9          And I said to him, where on Hempstead Turnpike are

10    you going?

11         He said 12 minutes away.

12         And that's when I told him I live 15 minutes away

13    from the Turnpike because Hempstead Turnpike turns into

14    Fulton Avenue.

15         I said, I can take you to the nearest spot and I

16    could drop you there, but -- and then I was on my way

17    because I have to turn -- right at the intersection that's

18    Hempstead Turnpike and that's Fulton Avenue so he's going --

19    and I live 15 minutes.  It's pretty close to where he's

20    going.

21         He said, okay.  Thank you so much.  Thank you very

22    much.  Is $40 okay?

23         I said it's not a charge because I'm not taking

24    you home.  I have to go to work.  I'm dropping you in the

25    intersection where you can get something.

 1          Okay.  Okay.  Thank you so much.  Let me go get my

 2   wife.

 3          He went -- I watched him in my rearview mirror.

 4   There was a bigger vehicle behind me.  I could not see where

 5   he went because it's -- after he parked to the side that

 6   vehicle hid him.  So I stood there in my car for a good

 7   minute or so waiting for him to come back.

 8          Then suddenly I heard two tappings on two windows,

 9   left and right.  I looked both ways.  Then I saw this

10   female, and he said she was in plain clothes, she was not,

11   she was in the police officer clothes, held up her badge,

12   NYPD, I wrote it down.

13          And she was like, do you know what you did?

14          I said no, what are you talking about?

15          Driver license and registration, please.  We will

16   tell you what you did when he comes back.  That's what she

17   said.

18          She took my paperwork, she went in -- I don't know

19   where they go because they disappeared, and then after a

20   while I stood there about eight or nine minutes waiting on

21   them.  Then I started asking questions and then a guy who

22   worked at the airport telling me what was going on.

23          I said, who's in charge here?

24          He pointed to me a tall gentleman.  I honked my

25   horn and I called him over.

1    And I said, can you explain to me what's going on

2  here because I had somebody come tapping on my window

3  pretending that they needed help desperately because they

4  have a pregnant wife, then suddenly a police officer came,

5  took my license and my registration, disappeared with it and

6  I don't know where they are gone.

7    He said, just hold on.  They'll soon come back,

8  explain what -- he didn't know what's going on.  He walked

9  away.

10    After that the lady came back and then she goes,

11  okay.  So you don't know --

12    I said no.  You said you were going to explain to

13  me, explain.

14    She held out a long piece of paper in her hand,

15  she held it behind her.

16    And she said, you were attempting to collect money

17  on federal property from a police officer.

18    I said, excuse me?  Did you see me collect money

19  or did you see me even know this person -- approach this

20  individual?  It's -- right?

21    She said, this is what the officer told me.

22    I said no.  Do you really want to know what

23  happened?

24    And I explained to her.

25    She told me that's what the officer told her.

1          And I said no.  No.  No.  It is not what the

2     officer told you because on your document you said you

3     observed.  Where were you because I did not see you?  You

4     both are like behind that big vehicle.  Where were you?

5          She walked way and said I could contest it in

6     court.

7          And I said, sure I will.

8     Q  And here we are today.

9          Now, I just want you to look at what has been

10    marked as your registration and license.

11         Could you open that up, please.

12    A  Let me go back.  I'm going to put it on speaker again

13    and go back to the e-mail.

14    Q  Okay.

15    A  Yes.  I have that up.

16    Q  Okay.  For purposes of examination as Respondent's

17    Number -- I believe we're on Number 3.

18         (RESPONDENT'S Exhibit 3 was marked for

19    identification.)

20    Q  What is that document?

21    A  It's my driver's license and registration for my

22    vehicle.

23    Q  Is that a true and accurate -- substantially accurate

24    copy of -- of your license and registration?

25    A  It is.

1    Q   Okay.  And what type of license do you have?

2    A   I have a regular license to drive as a private

3   citizen of this country.

4    Q   And also your registration document.

5         Does either of those documents indicate that you

6   are a taxi driver or have that classification license?

7    A   Absolutely not.  I have no reason for driving a taxi

8   whatsoever.

9              MR. MOSES:  Your Honor, I'd like to move this

10        into evidence as Exhibit Number 3 of Respondent.

11             (RESPONDENT'S Exhibit 3 was admitted into

12   evidence.)

13             MR. MOSES:  And, Your Honor, just -- also for

14        the record, do we already have the summons in evidence?

15        Is the summons in evidence?  If it's not I'd like to put

16        it into evidence.

17             THE COURT:  It's part of the record, but if

18        you'd like to put it into evidence we'll mark that as

19        Exhibit 4.

20             MR. MOSES:  I'd like the Court, please, take

21        notice of -- as Respondent's 4 the actual summons.

22             THE COURT:  All right.

23             All right.  So we'll move -- we'll move the --

24        your client -- the petitioner's copy of the summons as

25        Exhibit 4.

Case 1:23-cv-03497-PKC-SJB  Document 20-3  Filed 08/24/23  Page 62 of 85 PageID #: 345

1            (RESPONDENT'S Exhibit 4 was identified and

2    admitted into evidence.)

3            MR. MOSES:  Right.

4            And one final question to my client, Your

5       Honor.

6    BY MR. MOSES:

7       Q   On the summons, which is now Respondent's 4,

8    Mr. Johns --

9       A   (No verbal response.)

10      Q   -- was this summons issued to you by the officer --

11   the female officer in uniform?

12      A   Yes.

13      Q   Was -- was -- were any of the plain clothes officers

14   the ones who wrote you this summons?

15      A   Could you repeat the question.

16      Q   Were any of the plain clothes officers the ones who

17   brought you this summons or issued this summons?

18      A   No.  She was in uniform and she was the only one

19   there when she was -- when she came to issue the summons.

20            MR. MOSES:  I have no further questions of my

21       client.

22            THE COURT:  Okay.

23            Mr. Glynn, cross.

24            MR. GLYNN:  Yes, Your Honor.

25   CROSS EXAMINATION

1    BY MR. GLYNN:

2        Q   So, sir, I would first like to draw your attention to

3    Exhibit 1, which was the earnings statement that your --

4    that your Counselor moved into evidence.

5            Do you have that in front of you?

6        A   Hold on.  Let me go back and bring that up.  Hold on.

7            Yes -- hold on.

8            Go ahead.

9        Q   Yes.  So the -- it's correct to say that the incident

10   date was March 8th of 2022, correct?

11       A   Yes.

12       Q   And the earnings statement here covers a pay period

13   from July 9th of 2022 to July 22nd of 2022; is that correct?

14       A   Yes.

15       Q   Where are the last --

16       A   Would you like a pay stub --

17       Q   For the last four months where are the pay stubs for

18   that?

19       A   Pardon me?

20       Q   Did you hear the question?

21           For the last four months, from March 8th of 2022

22   up until July 8th of 2022, where are those pay stubs?

23       A   I have them, sir.  I can get them printed and sent to

24   you if you need them.

25       Q   Sir, you knew you were coming in today to testify?

Case 1:23-cv-03497-PKC-SJB  Document 20-3  Filed 08/24/23  Page 64 of 85 PageID #: 347

1      A  I'm still gainfully employed there.

2      Q  All right.  But you knew you were coming in today to

3  testify, you knew you had a court hearing today, so why

4  would you submit a pay stub from July 9th of 2022 to

5  July 22nd of 2022 when the actual incident date is March 8th

6  of 2022?

7      A  I'll answer your question directly.  My pay stub is

8  not to show that I got paid for that period.  It's to show

9  that I am gainfully employed.

10     Q  I'm sorry, I couldn't hear the answer.  Can you

11  repeat yourself.

12     A  My answer is my pay stub is not to show my pay for

13  that date.  It is to show that I'm gainfully employed and

14  still employed for 13 years.

15     Q  What -- wouldn't an earning statement from back in

16  March have covered the incident date?

17     A  This is proof of the fact that I'm employed, sir.  If

18  you -- the fact that I've been employed for 13 years and I'm

19  still employed with the company would show that I would have

20  pay stubs for all that period up to this point, right?

21     Q  Right.

22          So what we have here is we have an earnings

23  statement that proves that you were employed during -- from

24  July 9th of 2022 to July 22nd of 2022 --

25     A  That's incorrect.

1    Q  -- but you haven't -- let me finish my question --

2    let me finish my question.

3         But you haven't presented -- or your counsel

4    hasn't presented anything to show that you were employed at

5    Altice on the date of incident; isn't that correct?

6              MR. MOSES:  No.  It's --

7    A  That is not correct, sir.  That is your assumption

8    that you're trying to draw, but your assumption is

9    incorrect.

10   Q  Okay.

11             MR. GLYNN:  Your Honor, I'm going to move on to

12        the next document.  The Court can certainly give this

13        the weight it deems, you know, necessary or acceptable.

14   Q  So, sir, let's go on the next document.

15   A  What document are you referring?

16   Q  We're going to look at the JetBlue reservation

17   printout --

18   A  (No verbal response.)

19   Q  -- from March 8th.

20        Do you have that document in front of you, sir?

21   A  Yes.

22   Q  Okay.  I don't see a -- I don't see a passenger name

23   here.  I don't see a flight number.  I don't see a seat

24   number.

25        Can you explain that?

1      A   Right.  I am not the person who was taking the

2   flight.  This is the individual that I asked to send me the

3   information pertaining to his flight on that day.  He sent

4   me an e-mail that he received from JetBlue.

5      Q   So that was the only document that he could send you

6   to verify that there was a flight going --

7           (Overlapping speakers.)

8      Q   Right.

9           You didn't think -- you didn't think it was

10   appropriate to get something more specific?

11           MR. MOSES:  Your Honor, objection to the

12      question.  It's harassing the witness.

13      A   Sir, whether something --

14           MR. MOSES:  I'm directing my client not to

15      answer the question.

16           Mr. Johns, don't answer that question.

17           THE COURT:  Mr. Glynn -- Mr. Glynn, let's

18      rephrase the question, all right?  Let's rephrase the

19      question.

20           MR. GLYNN:  Yes, Your Honor.

21   BY MR. GLYNN:

22      Q   Did you ask your friend to supply you anything that

23   would show more specific as to the flight and the passenger

24   name?

25      A   I did -- right.  So I didn't ask him to send me

1   anything specific.  I just asked him to send me something

2   that I dropped him at the airport/that he had a flight on

3   that day.

4       Q  Okay.  And I'd like to go to your next document which

5   is the registration and -- the copy of the vehicle

6   registration and your New York State driver's license.

7       A  Go ahead.

8       Q  Right.

9           And I'm looking at the registration for this

10  vehicle and on the registration -- what does W-E-B-C-D-A

11  stand for?  If you know.

12      A  W-E --

13      Q  In the middle of the registration document, what does

14  that stand for?  If you know.

15      A  I have no idea was that actually means.  I don't

16  think it's significant and you can research it.

17      Q  Okay.  Now, I'd like to draw your attention to the --

18  to the incident date itself just so I'm clear.

19          It's your testimony that you were dropping off a

20  friend at the JFK Airport, correct?

21      A  Absolutely true.

22      Q  Okay.  Great.

23          And what's your friend name?

24      A  Mortzal Wilson (phonetic).

25      Q  What -- your friend's name.  What's your friend's

Case 1:23-cv-03497-PKC-SJB  Document 20-3  Filed 08/24/23  Page 68 of 85 PageID #: 351

1  name?

2      A  Mortzal Wilson.

3      Q  Okay.  I'm sorry.  I couldn't hear.

4          Morris Wilson (phonetic)?

5      A  Horzal (phonetic).  Horzal.

6      Q  Mortzal Wilson.  Okay.

7          And where does -- where does -- and is that a male

8  passenger?  Was that a male -- is that a male or a female,

9  your friend?

10     A  What does it matter if it's a male or a female?

11     Q  Well, I want to try -- well, it doesn't matter.  Just

12  answer the question, sir.

13     A  I refuse to answer the question because I don't think

14  it matters.

15         MR. MOSES:  Mr. Johns --

16     Q  I'm trying to identify who your friend is.

17         MR. MOSES:  I would just ask, Counsel, to

18     please -- relevancy and probative nature of your

19     questions.

20         Mr. Johns, you can answer that question.

21     A  It's a male.  It's a male.

22     Q  Okay.  And where -- where does Mr. Wilson live?

23     A  He lives in Jamaica.

24     Q  Okay.  Is that Kingston, Jamaica?

25     A  Kingston, Jamaica.

1      Q   Okay.  And how long have you known this friend?

2              MR. MOSES:  Your Honor, I'm objecting -- based

3      on relevancy I'm objecting, but, you know, unless he

4      tells us the foundation for this question.

5              MR. GLYNN:  Well, Your Honor, a lot of this is

6      going to go to the respondent's credibility.

7              THE COURT:  All right.  I'll allow the

8      question.

9      A   We've been friends ever since we were living in

10 Jamaica -- I was living in Jamaica actually.

11 BY MR. GLYNN:

12     Q   Okay.  And when your friend was here visiting in the

13 States how long was he here for?

14     A   He was there for two weeks.

15     Q   Two weeks.

16          Where was he staying?

17              MR. MOSES:  Your Honor, note my objection.

18     This is --

19     A   I'm not going to divulge that person's information

20 because he's not on trial and neither is -- trial or

21 anything pertaining to the visit of coming to this country.

22 That's no reason --

23              THE COURT:  Mr. Johns --

24          (Overlapping speakers.)

25              THE COURT:  -- if there are objections I would

1      appreciate it coming from counsel and not you, sir.

2              MR. MOSES:  Your Honor, I do object.  It seems

3      improper and not relevant.

4              THE COURT:  Mr. Glynn, maybe you want to

5      rephrase the question.

6              MR. GLYNN:  Yes, Your Honor.  Okay.

7   BY MR. GLYNN:

8      Q  So where was your friend staying while he was here in

9   the States?  His address?

10     A  Okay.  He stays in Long Island as well as in Brooklyn

11  at times.

12             MR. MOSES:  Note my objection, Your Honor.

13             MR. GLYNN:  Okay.

14  BY MR. GLYNN:

15     Q  Right.

16             And on the morning of the -- of the incident, how

17  did he contact you?

18     A  He didn't contact me.  He was staying at my home

19  because I was taking him to the airport.  So he would stay

20  here.  He slept at my home.

21     Q  Okay.  All right.

22             Okay.  And when you were -- when you were

23  transporting your friend to the airport did he give you any

24  gas money to do that?

25     A  I do not charge my friend to take them anymore.  So I

 1   do -- I have no need to do that.

 2      Q   Okay.  And just going back to your work.

 3          What days do you work and what hours are your

 4   shift?

 5      A   I work from 12:00 to 9:00 p.m.

 6      Q   12:00/noon to 9:00 p.m.?

 7      A   Correct.

 8      Q   Okay.

 9          Okay.  Now, sir, isn't it correct that a -- a male

10   hailed you at JFK Airport Terminal 5 and you responded to

11   that hail?

12          MR. MOSES:  Objection.  I'm directing him not

13      to answer.  That's very general.

14          You're going to have to be more specific,

15      Counsel.

16          MR. GLYNN:  Okay.  I can do that.  That's --

17      yes.  I'll rephrase the question.

18   BY MR. GLYNN:

19      Q   Sir, you heard the inspector testify.

20          Isn't it correct that the inspector hailed you and

21   that you pulled your vehicle up to meet him?

22          MR. MOSES:  Objection.

23          Go ahead.  You can answer the question,

24      Mr. Johns.  Thank you.

25      A   That is not true, sir.  I could not pull my vehicle

Case 1:23-cv-03497-PKC-SJB   Document 20-3   Filed 08/24/23   Page 72 of 85 PageID #: 355

1  up to meet him when my vehicle was already stopped and

2  letting out my friends and after he came out I was pulling

3  out.  Why would I pull my vehicle up?  There was another

4  vehicle in front of me and I was pulling out so pull it out

5  to where?

6      Q  You were pulling out?  Okay.

7          So -- so how did the --

8      A  (Indiscernible.)

9      Q  -- interaction between you and the undercover officer

10  start?

11      A  Pardon me, go ahead.  Repeat the question.

12      Q  Yeah.  How did the interaction start between you and

13  the undercover officer?  How did that -- how was that

14  initiated?

15              MR. MOSES:  Your Honor, asked and answered.

16              I'll permit him to answer as long as this type

17      of thing doesn't continue.

18              THE WITNESS:  Okay.  Should I go ahead and

19      answer?

20              MR. MOSES:  Yes.

21              THE WITNESS:  All right.

22      A  So after my friends -- I locked my vehicle and the

23  door was closed.  All my windows up because that particular

24  morning was a little bit chilly.  I put my indicator on, I

25  wound my steering to the left to pull out because I had to

1   do it slowly because the other vehicle was in front of me.

2          And just as I was pulling out there was a loud tap

3   on my window like this.  I looked around and I saw this

4   gentleman.  I took the window down slightly, which was about

5   a quarter, and then he asked me if I know what is the fare

6   to go to Hempstead Turnpike.  I know that he testified a

7   number of Hempstead Turnpike.  That was never mentioned in

8   his -- out of his mouth.

9          He said -- he just said Hempstead Turnpike.

10          I said, I do not know.  Have you tried asking

11   everybody out there?

12          He said, nobody knows.

13          I said, have you tried the Uber app because when

14   you do they will give you an estimate as to what the cost

15   is.

16          He said he doesn't have it.  He doesn't do it --

17   doesn't have it and that was his explanation.

18          So that's how the conversation started.

19   BY MR. GLYNN:

20      Q  Right.

21          Sir, isn't it correct that you told the undercover

22   officer that you would take him there for $40?

23      A  That is not true, sir.  I did not give him no money.

24   If I told him I don't know what the fare is, now why would I

25   turn around to them -- I'm going to charge you $40?  It

1   doesn't make any sense, does it?

2       Q  Right.

3           But it is your testimony that you did agree to

4   transport him?

5       A  I did tell him when -- after he gave me his location

6   that -- I asked him where Hempstead Turnpike he said 10 to

7   12 minutes away, I did explain to him I'm living 15 minutes

8   away, I could drop you at an intersection because that

9   intersection turns into Fulton Avenue.  And if you're 10 --

10          And I explained to him in more than uncertain

11  terms you will be very close to where you're going if I drop

12  you there.  It's just 10 to 12 minutes away.  That's when he

13  offered to give me money.

14          And I said, no.  I'm not charging because I'm not

15  taking you home because I have to go to work.

16      Q  Right.

17          Okay.  And it's fair to say that you never saw

18  this -- you've never seen this gentleman -- this undercover

19  TLC officer before, correct?

20      A  I have never seen him before.  I've never seen him

21  before.  I'm not someone who drives --

22          Mister, I can tell you this.  I go from work to

23  home.  I go nowhere.  I don't go to parties.  So I never

24  seen him before at all.

25      Q  All right.  So he was a complete stranger to you,

1   correct?

2       A  He was a complete stranger.  Yes.

3       Q  Right.

4            And, sir, do you typically give complete strangers

5   rides?

6            MR. MOSES:  Your Honor, objection.  That's

7       really harassing and improper.

8            MR. GLYNN:  That wasn't harassing, Your Honor.

9       I think it's a direct question.

10           MR. MOSES:  No.  It's --

11           MR. GLYNN:  I don't see what --

12           MR. MOSES:  -- generalized question that

13      characterizes my client as given -- as imputing

14      something to him which is not true.

15           This is a man that said my wife is pregnant,

16      okay, that was in obvious distress and you're

17      characterizing --

18           MR. GLYNN:  Objection.  Counsel is testifying

19      now.  I'm going to object to Counsel testifying.

20           THE COURT:  All right.  I think we can rephrase

21      that question.

22           MR. GLYNN:  Yes, Your Honor.

23   BY MR. GLYNN:

24      Q  Sir, this was a -- this was a male that approached

25   you, the TLC undercover officer, correct?

1     A   I don't know if the person with a TLC undercover

2   officer or not.  The person approached me --

3     Q   Okay.  But the person that approached you and asked

4   you for a ride was a male, correct?

5     A   When they approached -- not just asking for a ride.

6   They approached asking for information.

7     Q   Okay.  And where were you intending to place that

8   person?  In the front seat with you or in the backseat

9   behind you?

10              MR. MOSES:  Objection.  Calls for speculation.

11              MR. GLYNN:  If he knows the answer.  I mean, he

12        was -- the respondent was driving the vehicle.  I don't

13        know what his intentions were.

14              THE WITNESS:  You want me to answer the

15        question, Counsel?

16              MR. MOSES:  Your Honor, I'd like a ruling on

17        that, whether he needs to answer.

18              And I just want to remind everybody I have to

19        be in the Bronx on a guardianship hearing of a disabled

20        woman at 2:15 so I can't go beyond lunch.

21              THE COURT:  Okay.  I think -- I think you can

22        answer that.

23              THE WITNESS:  Okay.

24     A   So I'm not sure about you, Counsel, but whenever

25   somebody -- when you're giving somebody a ride it's --

```
 1   BY MR. GLYNN:
 2      Q  Sir, just answer -- sir, answer the question, please.
 3   The question was very specific.  We don't need a story.
 4   Just answer the question.
 5            MR. MOSES:  All right.  If you don't know, you
 6       don't know.
 7      A  No.  No.  I'm answering your question with a
 8   explanation.  It's not a specific.
 9      Q  The question was where were you going to place this
10   passenger?  In the front seat with you, or in the rear
11   passenger seat?
12      A  I do not place anybody in my vehicle, sir.  And I
13   wouldn't place anybody in my vehicle.  If my door opened --
14   if I need somebody to ride -- to open any door they sit
15   anywhere they want.  You don't tell -- I think it's rude to
16   tell somebody, oh, sit in the back or sit in the front.  I
17   don't do that.
18      Q  Right.  Right.
19            But you -- that day you were going to permit a
20   complete stranger to get into whatever part of the vehicle
21   they wished to?
22            That's your testimony?
23      A  All right.  That's not my testimony, sir.
24            MR. MOSES:  No.  Objection.  Objection.
25      A  That's not my testimony, sir, and I completely would
```

1    explain to you that you don't know me.  And if I should --

2    if I should draw anybody who know me over the years

3    including my church of who I am and a person -- somebody was

4    in distress, it has nothing to do with complete strange.

5            And as a matter of in fact, I did testify earlier

6    that I was watching the individual in my rearview mirror

7    until the vehicle behind me was blocking because that

8    vehicle was behind me.  If I had my doubts --

9            But I have no reason to think that this man was a

10   killer if he has a pregnant wife that gets -- that he needs

11   to get somewhere.  Whatever I can do to help as a citizen of

12   this country I think it's my duty to do it to help them

13   because they are in distress.

14   Q  Okay.  So the fact that -- the fact that he told you

15   he had a pregnant wife was cause for you to allow this

16   unknown person into your vehicle?

17   A  Only to the circumstances at the time of this

18   morning, which was pretty chilly that morning, I decided,

19   okay, fine.  If you're going there I could drop you at that

20   location.

21   Q  Okay.

22           MR. GLYNN:  I have no further questions for the

23       respondent.

24           THE COURT:  All right.

25           Mr. Moses, any redirect?

 1              MR. MOSES:  Yeah.  Yeah.

 2    REDIRECT EXAMINATION

 3    BY MR. MOSES:

 4       Q  Just -- let's go back to the pay stub, please.

 5              THE COURT:  Okay.  I'm going to ask everybody

 6       to speak up again because everybody is fading out.

 7              MR. MOSES:  Right.  Right.  I am.

 8    BY MR. MOSES:

 9       Q  So, Mr. Johns, would you open up your pay stub,

10    please.

11       A  Hold on.

12       Q  Yeah.  Thank you, sir.  Thank you.

13       A  Hold on.

14           Yes.  I open it up.

15       Q  Okay.  Where it says, gross pay year to date, what

16    does that number indicate?

17       A  Hold on.  Hold on.  I'm trying to do it on my phone.

18    It's very small.  Hold on.

19       Q  Okay.

20       A  31,557.84.

21       Q  What does that number indicate?

22       A  31,557.84.  $31,557.84.

23       Q  And is that the amount that you received while

24    working for this company for -- during the year -- from the

25    beginning of the year --

1      A  Yes.  Up to this point.  Yes.

2      Q  -- up to this point?

3      A  Up to that particular point.

4      Q  So the monies that you were paid would also be

5   inclusive of the day that you were issued this ticket?

6           Is that yes or no?

7      A  Yes.

8      Q  Okay.

9           MR. MOSES:  No further questions, Your Honor.

10          Your Honor, if I --

11          THE COURT:  All right.

12          MR. MOSES:  If I could say in summation my

13   position.

14          THE COURT:  I'm sorry, can you repeat that.

15          MR. MOSES:  Yeah.  Can I just argue in

16   summation?

17          THE COURT:  Sure.

18          So nothing else from you, correct?

19          MR. MOSES:  Nothing.  No.

20          THE COURT:  Okay.

21          All right.  Mr. Glynn, did you have anything

22   else?

23          MR. GLYNN:  No, Your Honor.

24          THE COURT:  Okay.

25          All right.  So, Mr. Moses, go ahead with your

1    summation.

2         MR. MOSES:  Yeah.  I mean, the Officer, you

3    know, testified -- let's be very fair about this.

4         You know, I know what this Court will address

5    and the Court I believe should address credibility --

6    the credibility of the officer.  He couldn't recall very

7    specific testimony.  Contrast that with the credibility

8    of my client.  His evidence was not clear and

9    convincing.  My client's evidence was absolutely

10   detailed, absolutely clear and convincing.  And he never

11   -- he never said, give me money for this lift.  It was

12   altruistic.  It was -- had nothing to do with being

13   hired to do the work.  Clearly he was led to believe

14   that this was a person in distress.

15        While we don't have a duty and an obligation to

16   a person who has a pregnant wife needs to get somewhere

17   and while there's not a legal obligation, the fact that

18   my client suffered legal detriment -- legal detriment in

19   doing this is something very good in terms of public

20   policy.  And he didn't violate the law.  There was no

21   violation of this law.

22        In fact, it was improper to stop him in the way

23   he was stopped.  There was no articulable suspicion.

24   There was no reason to stop him.

25        So this is -- in conclusion, this is --

1   moreover his wheel was turned, his hour light was on,

2   and he was leaving though -- our position is that's the

3   testimony -- that's the detailed testimony.

4          Our position is this violation should be

5   dismissed.

6          Thank you very much, Your Honor.

7          THE COURT:  Thank you, Mr. Moses.

8          Mr. Glynn.

9          MR. GLYNN:  Yes, Your Honor.  I'd ask the Court

10  to credit the sworn statement and the narrative which is

11  signed under perjury of law.  I would submit that and

12  make that a prima facie case.

13         I would submit that the decoy officer who

14  testified today testified credibly and testified that

15  the respondent responded to his hail, rolled down the

16  vehicle window, and when the officer said that he was

17  going to 2222 Hempstead Turnpike the respondent agreed

18  to do this for a $40 fare.

19         Again, I would submit that the -- that the

20  officer was specific as to what transpired with respect

21  to the destination and the agreed-upon fare.

22         I would submit that the respondent's testimony

23  is not credible and is self-severing.  He submitted a

24  document for JetBlue which doesn't indicate a passenger

25  names, seat, or any other identifying information.

Case 1:23-cv-03497-PKC-SJB   Document 20-3   Filed 08/24/23   Page 83 of 85 PageID #: 366

1          I will submit, again, that the -- that overrule

2     the respondent's testimony is -- again, basically

3     incredible and that I would find that the -- ask the

4     Court to find that the respondent violated the rule

5     cited, 19-506(b)(1), as he was an unlicensed vehicle

6     operating as for hire.

7          I would just only add that the respondent's

8     testimony that he was willing to accept a straight -- a

9     strange male passenger into his vehicle because he felt

10    sorry him and was willing to do him a favor is not a

11    credible explanation as to what transpired during the

12    incident.

13          THE COURT:  All right.  Thank you.

14          All right.  Thank you, everyone.

15          So I'll make my decision.  Either side who does

16    not agree with me will have 30 days to appeal the

17    decision.

18          Mr. Moses, the respondent will receive the

19    Court's decision in the regular mail within the next

20    couple of days.

21          Thank you, everyone.  Take care.

22          MR. GLYNN:  Thank you, Your Honor.

23          MR. MOSES:  Your Honor, I have a question for

24    you procedurally.

25          If we want to get a copy of the recording of

1           what took place is that -- how would he do that?

2                   THE COURT:  I believe you can reach out to the

3           court -- the clerk's office, but it would probably be

4           after the decision was rendered at that time.

5                   MR. MOSES:  Very good.

6                   Have a pleasant day, everybody.

7                   Thank you Mr. Johns.

8                   MR. GLYNN:  You too.

9                   Thank you, Your Honor.

10                  Thank you Mr. Moses.  Have a good day.

11                  MR. MOSES:  Bye-bye.

12                  (Proceedings concluded.)

13                          * * * * *

14

15

16

17

18

19

20

21

22

23

24

25

Case 1:23-cv-03497-PKC-SJB  Document 20-3  Filed 08/24/23  Page 85 of 85 PageID #: 368

1                         <u>CERTIFICATION</u>

2    I, LYNETTE L. CHASE, certify that the foregoing transcript

3    of the telephonic proceedings in the Office of

4    Administrative Trials and Hearings, Hearings Division, in

5    the matters of TAXI AND LIMOUSINE COMMISSION v MATTHEW A.

6    JOHNS, Summons No. 73090726A, was prepared using the

7    required transcription equipment and is a true and accurate

8    transcript of the recording.

9

10   SIGNATURE:

11   AGENCY NAME:          <u>Bee Reporting Agency, Inc.</u>

12   ADDRESS OF AGENCY:    <u>55 Maple Avenue, Suite 204</u>

13                         <u>Rockville Centre, NY 11570</u>

14   DATE:                 <u>April 4, 2023</u>

15

16

17

18

19

20

21

22

23

24

25